UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>        Plaintiff,<br><br>vs.<br><br>EVERTON SEWELL,<br><br>        Defendant. | Case No. 22-cv-6274<br><br>COMPLAINT |

Plaintiff Securities and Exchange Commission ("the Commission") alleges as follows:

## SUMMARY OF ALLEGATIONS

1. This matter involves misconduct by Everton Sewell, the former Chief Financial Officer of Rochester City School District (the "District"), in connection with a municipal bond offering by the City of Rochester, New York (the "City") in August 2019.

2. The stated purpose of the bond offering was to (1) provide financing for the District, as well as other City projects, and (2) provide cash flow financing for the District for fiscal year 2020.

3. The District's financial condition was key to the bond offering because the District was the expected source of the repayment of a portion of the bonds, and the District is the largest component of the City's overall budget.

4. Prior to the offering, Sewell knew that the District was facing at least a $25 million budget shortfall for the end of fiscal year 2019. Despite this, Sewell made material misrepresentations and omissions regarding the magnitude of the

1

budget shortfall to the credit rating agency for the bonds, leading the rating agency to believe the District's significant cash flow decline in fiscal year 2019 and need for cash flow financing in fiscal year 2020 were solely the result of timing of the District's receipt of New York State aid.

5. After outside auditors discovered the extent of the District's budget deficit in the fall of 2019, the credit rating agency ultimately published a downgrade to the City's debt rating.

6. As a result of the conduct described above, Sewell violated Sections 17(a)(1) and 17(a)(3) of the Securities Act of 1933 ("Securities Act") and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), and Rule 10b-5 thereunder.

## JURISDICTION AND VENUE

7. The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, Sections 20(b), 20(d), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), 77v(a)], and Sections 21(d), 21(e), 21(f) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), 78u(f), 78aa].

8. Defendant, directly or indirectly, made use of the means or instrumentalities of interstate commerce or of the mails, in connection with the transactions, acts, practices, and courses of business alleged in this Complaint.

9. Venue is proper in this district pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa] because Sewell resides in the City and the District is located there as well. Furthermore, certain of the transactions, acts, practices, and courses of conduct constituting violations of the federal securities laws occurred within this district.

## THE DEFENDANT

10.  **Sewell** resides in Rochester, New York. Sewell served as the District's chief financial officer from December 2016 to October 2019. Since December 2019, Sewell has worked as a school business official in New York.

## RELEVANT ENTITY

11.  **The District** is a New York public school district located in the City of Rochester that serves approximately 30,000 students. It is governed by a seven-member elected Board of Education (the "Board"). The District is dependent upon the City to issue debt and to levy taxes on its behalf. The District operates on a July 1 to June 30 fiscal year.

## FACTS

**A.  The City Sold the Notes in August 2019**

12.  In August 2019, the City sold a $68,905,000 bond anticipation note ("BAN") and a $50,000,000 revenue anticipation note ("RAN"). Both notes were general obligations of the City, the payment of which was secured by the City's faith and credit.

13.  The stated purpose of the BAN was to provide financing for the District, as well as other City projects, and the stated purpose of the RAN was to provide cash flow financing for the District for fiscal year 2020. Because the District was the expected source of the repayment of the RAN and because the District is the largest component of the City's overall budget, the District's financial condition was important to investors in both the RAN and the BAN.

**B.     The District's Financial Condition Was Deteriorating**

14.     From December 2016 to October 2019, Sewell was the chief financial officer at the District and was in charge of the District's budget and financial reporting processes.  Sewell was the primary communicator of the District's financial information to the Board, the City, and the credit rating agencies.

15.     The District's fund balances (differences between assets and liabilities) indicate its ability to address future unexpected financial challenges and are a primary metric used to analyze the District's financial health.  Between 2014 and 2018, total fund balance in the District's General Fund declined by over $27 million (from $77,139,826 to $49,636,366) due to recurring operating deficits.

16.     The District also had an internal "reserve policy" which required it to preserve a portion of its fund balance to address future unexpected financial challenges.  According to its policy, the General Fund was required to maintain committed, assigned and unassigned fund balances (subcategories of total fund balance) between 5% and 15% of operating expenses.  Notwithstanding the decline in total fund balance between 2014 and 2018, the District remained within its reserve policy as of the end of fiscal year 2018, and in February 2019, a credit rating agency stated that "fiscal 2019 [wa]s trending positively for both the city and the [District]."

17.     For fiscal year 2019, the District's adopted budget included the use of $15 million in fund balance to cover operating deficits.  However, by November 2018, the District's overspending was accelerating.  The bulk of the overspending was to cover teacher salaries.  The District experienced a $63 million cash decline during fiscal year 2019 due, in part, to the District's overspending.  This was an unusually large decline in cash compared to prior years.  To pay expenses, the District increasingly began to rely on the City for short-term loans.

4

18. Sewell knew as early as June 2019 that the District's fiscal year 2019 budget was going to be overspent by at least $25 million and that this would, in turn, violate the District's reserve policy.

19. Internal reports prepared by Sewell's staff and provided to Sewell in June and July 2019 showed estimated deficits of between $25 million and $50 million. However, Sewell did not inform anyone outside of the District's finance department of the projected budget deficits until late August 2019, after the bonds had been issued.

C. **Sewell's Material Misrepresentations and Omissions to the Credit Rating Analyst about the District's Financial Distress**

20. Prior to the bond offering, the City requested credit ratings for the bonds, as it typically did with its bond offerings. Credit ratings provide investors with an assessment of the creditworthiness of an issuer or financial instrument. The credit rating analyst typically reviews the financial statements and other relevant information to determine what rating to assign.

21. The rating analyst for the City's bonds relied on the City and the District to provide accurate estimates for how their 2019 fiscal year would end. An important factor in the analyst's rating of the City's debt was whether the City and the District would end the 2019 fiscal year with a decrease in their fund balances or liquidity.

22. On July 11, 2019, Sewell attended a meeting with representatives from the City and the credit rating agency to provide financial information about the District. During the meeting, the rating analyst asked how much fund balance (reserves) the District expected to utilize for the fiscal year 2019. Sewell stated that the District expected to use $15 million in fund balance, which was substantially in line with its adopted budget that was approved by the Board at the

beginning of the fiscal year. Sewell did not disclose that the District's actual expenses were trending significantly higher than the adopted budget.

23. Sewell also misrepresented the reason for the District's $63 million cash decline. When the ratings analyst asked Sewell to explain how the District was predicting using only the budgeted $15 million in fund balance when cash had declined by $63 million, Sewell said the decline was due to accounting treatment and timing issues in the receipt of cash. In fact, as Sewell was aware, the cash decline was due to the District's overspending on salaries, among other things.

24. Based in part on the misleading information provided by Sewell, on July 16, 2019, the credit rating agency assigned its highest short-term rating, "MIG 1," to the BAN and the RAN, and maintained its "Aa3" rating for the City's general obligation debt. In its press release, the rating agency explained its rating to investors, stating that, among other things, the rating was due to the District's "strong liquidity coverage" and "adequate management of cash position, despite recent declines in cash."

25. On July 17, 2019 and July 24, 2019, the City disseminated the POS and the Supplemented POS, respectively, to investors. On July 29, 2019, the City disseminated the Final OS to investors.

26. On July 25, 2019, the City offered and sold the BAN and RAN through a competitive sale. On August 7, 2019, the bond deal closed and the City issued the notes.

27. Sewell misrepresented the District's then-current financial status when he told the credit rating agency that he expected the District to end the 2018-2019 school year substantially in line with its budget despite internal reports to the contrary. Sewell was aware of internal reports showing a significant budget deficit between $25 million and $50 million as of the end of the fiscal year. Sewell ignored those red flags, falsely represented that the District was on track to meet its

2019 budget, and failed to disclose the projected overspending when asked by the credit rating analyst. Sewell knew or was reckless in not knowing that his misstatements and omissions were improper.

### D. In September 2019, an External Auditor Revealed the District's Substantial Budget Deficit, Leading to a Ratings Downgrade

28. On September 18, 2019, less than two months following the issuance of the notes, the District's external auditor alerted District management that the District was facing a $30 million budget shortfall for fiscal year 2019.

29. On September 26, 2019, the credit rating agency placed the City's credit ratings on review for possible downgrade, citing reports that the District incurred a nearly $50 million budget shortfall for fiscal year 2019 that "far exceeded [the credit rating agency's] expectations for declines to reserves," which was $15 million.

30. On October 3, 2019, the City filed a voluntary notice to investors on the Municipal Securities Rulemaking Board's Electronic Municipal Market Access ("EMMA") system of a "discrepancy between financial information provided by the [District] to [the credit rating agency] and the estimated actual information subsequently received."

31. On October 10, 2019, Sewell resigned as chief financial officer of the District.

32. On December 3, 2019, the District's external auditor completed its audit of the District's fiscal year 2019 financial report. The audited financials revealed a $42 million operating deficit, or $27.6 million more in spending than had been budgeted, which consumed all of the District's "reserve policy" fund balance as well as $8.9 million of reserves restricted for other purposes.

33. On December 9, 2019, the rating agency downgraded the City's long-term rating to "A2" and assigned a negative outlook. It also downgraded the City's

BAN to "MIG 2" but affirmed the "MIG 1" rating on the RAN based on the agency's rating methodology at the time. In its credit opinion, the rating agency cited the decline in the District's fund balance by $42 million, which was approximately $30 million more than District management had projected during the July 11th ratings call. "There is no clear explanation of how the July 2019 estimate was so far off," the ratings agency wrote in its credit opinion.

34.   To address the District's budget shortfall, the State of New York granted the District a $35 million loan in May 2020, which is expected to be repaid over 30 years without interest. In exchange for the loan, the State Commissioner of Education appointed a monitor to provide oversight of the District for a three year period beginning in May 2020.

## CLAIM FOR RELIEF

**Violation of Sections 17(a)(1) and (a)(3) of the Securities Act**

35.   Paragraphs 1 through 34 are hereby re-alleged and are incorporated herein by reference

36.   By reason of the foregoing, Sewell directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, knowingly or recklessly employed a device, scheme or artifice to defraud, and engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchasers.

37.   By reason of the foregoing, Sewell directly or indirectly, violated and unless enjoined will continue to violate, Sections 17(a)(1) and (a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1), 77q(a)(3)].

**Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder**

38. Paragraphs 1 through 34 are hereby re-alleged and are incorporated herein by reference.

39. By reason of the foregoing, Sewell directly or indirectly, by use of the instrumentalities of interstate commerce or of the mails, or of the facilities of a national securities exchange, in connection with the purchase or sale of securities, knowingly or recklessly, has employed a device, scheme, or artifice to defraud; made an untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and engaged in acts, practices, or courses of business which operates or would operate as a fraud or deceit upon any person.

40. By reason of the foregoing, Sewell directly or indirectly violated and unless enjoined will again violate 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court:

I.

Issue findings of fact and conclusions of law that Defendant violated Sections 17(a)(1) and (a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1), 77q(a)(3)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

II.

Issue a judgment permanently restraining and enjoining Defendant and his agents, servants, employees, and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal

service or otherwise, from directly or indirectly violating Sections 17(a)(1) and (a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1), 77q(a)(3)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

III.

Issue a judgment permanently restraining and enjoining Defendant from directly, or indirectly, (i) participating in any issuance, purchase, offer, or sale of municipal securities, as defined in Section 3(a)(29) of the Exchange Act [15 U.S.C. § 78c(a)(29), including but not limited to engaging or communicating with a broker, dealer, municipal securities dealer, municipal advisor, bond insurer, nationally recognized statistical rating organization, investor, issuer or obligated person for purposes of issuing, purchasing, offering, or selling any municipal security; and (ii) participating in the preparation of any materials or information, which Defendant should reasonably expect to be submitted to the Municipal Securities Rulemaking Board's Electronic Municipal Market Access system in connection with an offering or a continuing disclosure obligation, or which Defendant should reasonably expect to be provided to investors in connection with any offering (including a private placement) of municipal securities, provided however, that such injunction shall not prevent Defendant from purchasing or selling municipal securities for his own personal account.

IV.

Order Defendant to provide a copy of the judgment by email or mail within 10 days of the entry of the judgment to any issuer of municipal securities or obligated person with which Defendant is employed as of the date of the entry of the judgment.

V.

Order Defendant to pay civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 78t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

VI.

Grant such other relief as this Court may deem just and appropriate.


Dated:  June 14, 2022                                    Respectfully Submitted,


                                                               s/ Eugene N. Hansen
James M. Carlson
Eugene N. Hansen
U.S. SECURITIES AND EXCHANGE COMMISSION
100 F St. NE
Washington, DC  20549
Tel:  (202) 551-6091
hansene@sec.gov

*Attorneys for Plaintiff*
Securities and Exchange Commission